Mr. Ye is a native and citizen of the People's Republic of China that sought asylum, withholding of removal, and protection under our law. Say he's a Republican from China? A native and citizen of the country of China. If he's a Republican from China, you've already got one vote against you. My apologies if I misspoke. He alleged that on account of being forced to marry the mentally disabled daughter of a local village leader, he was subjected to disproportionate harm after his arrest and beating by police, and he traveled to Ecuador in November 2003. Mr. Ye remained in Ecuador until December 2004 when he was granted parole by the Department of Homeland Security to enter the United States. Specifically in this matter, the immigration judge found that Mr. Ye was pretty consistent with his statement, his testimony attached to his I-589 as to what he claimed happened to him in China. However, there were several issues in this case, namely firm resettlement, an adverse credibility determination, an issue with cooperation, and an issue with the social group or nexus. Turning to the firm resettlement issue, Mr. Ye has alleged that the Department of Homeland Security has not met their initial burden to show by either direct or indirect evidence that he was firmly resettled or offered a position of firm resettlement in the country of Ecuador. Specifically, the Department of Homeland Security submitted evidence in the form of an Ecuadorian ID card that was valid from August 2004 to August 2016, and a certificate of census that was valid from July 2004 to July 2005. Namely, the government has argued that based on its documentation from the Refugee Board of Canada that petitioner's permanent resident status is premised on a document from Ecuador. You didn't attack the authenticity of the documents, did you? Your Honor, the... Answer my question, please. Did you attack the authenticity of the documents? No, Your Honor. So if you didn't attack the authenticity of the documents, then the government presents its case and the IJ has a determination to make, and that's a factual determination, isn't it? It is, Your Honor. And therefore, I must affirm or deny the petition in this case if there's any substantial evidence, right? Correct. However... And therefore, if there's substantial evidence, and you agree not attacking the authenticity, he moved to Ecuador, he received the certificate of census, he had an ID card from Ecuador that was issued and didn't expire until 2016, he received a 10-3 immigrant visa from there as an industrial investor, entitling him to the right to residency there. Why is that not substantial evidence? Your Honor, as to the authenticity of the documents, petitioner's an unusual predicament. He claims that he was fearful of returning to Ecuador as well as China, and he was ultimately removed to the country of Ecuador by the immigration judge. If petitioner's continual story... Wait, now, can he file a petition for asylum from Ecuador? In Ecuador, Your Honor? No, here. Can he claim that he fears being returned to Ecuador, and therefore he needs asylum in this country? Did he file for that? He did not, Your Honor. He filed for asylum from the People's Republic of China. Okay, so I'm not sure what fearful of returning to Ecuador has to do with anything then. Well, he was fearful that agents or individuals from the People's Republic of China were going to locate him and arrest him while he was present in Ecuador. The issue is, with regard to authentication, is petitioner's continual testimony was that he didn't know anything about these documents. He did not know how they were obtained. He knows that his sister utilized someone to obtain these documents. Right, but he can look at the documents. He can go and talk to somebody. He can look at the documents and see that he's lawful in Ecuador for a period of 10 years until 2016. The issue is, in this case, is that I do not believe and petitioner does not believe that the Ecuadorian ID is absolute evidence of his residence in the country. But my worry is this, and that again, Judge Bybee, steals my question. We're looking for substantial evidence. We can't make that determination again. All we can do is say, is there substantial evidence to sustain what's done? You don't attack the authenticity of that. And so we have to look at it as unauthorized, I guess, authentic, and then say no substantial evidence? Your Honor, an attorney owes a duty to their client. If we were to send the document for authentication to the country of Ecuador and it's found to be fraudulent or improperly obtained, and he's removed to the country of Ecuador, we're putting petitioner in harm's way. But that also would then suggest that he's not firmly resettled in Ecuador, which is the obligation that you had here. Correct. However, the document... It's a two-edged sword, I understand, but you're trying to get admission here. And so it might have been in your interest to show that he was not firmly resettled in Ecuador by showing the document was not legitimate. However, we do have to balance petitioner's fear of harm and being potentially returned to that country. However, the refugee document from Canada that the government submits in the record at AR 319 says that an Ecuadorian identification card with a certificate issued by the Director of Consular Services legally registered with the Registry of Foreigners is the sole official document that proves the right to residency. We don't have in this record the certificate issued by the Director of Consular Services. What we have is an identification card and what we have is a census card. It's not the same documents that are referred in the government's record. But again, this is a question of fact, Counselor. And now we have to say substantial evidence can't be perfect, just substantial. That's the worry. I mean, that's why I wanted to put the question to you. I do see the court's position here. However, in this matter, in balancing the potential harm to petitioner, there was no authentication done in this matter as to the document. Petitioner's position is that the identification card and the documents provided by the Department of Homeland Security do not show that he's been firmly resettled. Well, you know, look, he was brought here by the DHS, right? Correct, Your Honor. And they brought him here. And they were conducting an investigation into human trafficking. And for some reason, he was given parole so he could help identify Ecuadorian smugglers. And then we flew him from Ecuador to Miami and paroled him into the U.S. And then we flew him to New York. And then we left him there. He was never asked to testify or take part in any investigation. And DHS just never followed up. That's correct, Your Honor. Yeah. So what obligation do you think arises from that? Well, Your Honor, the Department of Homeland Security was never able to provide any additional information as to why he was specifically paroled in. And he's been here for over 12 years. As far as we know, I think this is correct, he has no criminal record. And maybe the best course for him would pursue mediation so that the government can exercise prosecutorial discretion. I certainly agree. Under the Johnson factors. Do you know what those are? Yes, Your Honor. Petitioner has sought prosecutorial discretion under the Johnson Memorandum issued November 2014. He submitted a, this is not in the record. Well, that's two years ago. No, under the memorandum in 2014. He recently sought it with evidence that he had no criminal record, Your Honor. He has sought that, and he would still desire that relief or that form of relief if available to him. However, the department has respectfully declined that. Well, would your client care to go to mediation? He would, Your Honor. No, yeah. Yes, he would. No, if the government agrees, yeah. I would like to change, if I could, to the credibility determination. Yes, Your Honor. It seems to me that in the credibility determination, he provided no documentation to support his claim about this problem with his stepfather or father or whatever it was, and the IJ said he lacked credibility because if the mother moved into another household, the household register would have indicated that the father was the stepfather, and it didn't, and so he was therefore incredible, correct? That's correct. Then he provided no documentation, and it seems to me in your 28J letter you say, but you needed a notice of the necessity of the corroborating information. If this court finds Petitioner credible on the other grounds, such as with regard to his testimony regarding his stepfather, his determination of who his stepfather is, and with regard to his implausible travel plans, as he was unable to find that, Petitioner believes that he's entitled to notice an opportunity to provide the documentation. Under Wren. Wren and Zai, Z-H-I. Well, but you didn't exhaust that to the IJ or the BIA, did you? Well, Your Honor, I will argue this is that. . . I mean, Wren was on the books in 2011. Correct, Your Honor. And the IJ's decision in this case was in June of 2012, and the BIA's was in August of 2013. So if you were going to bring this question up for us, it should have been exhausted, shouldn't it? Understood. However, if we look at the corroboration issue here in this matter, the judge cited six specific reasons why she was corroborating. Just a minute. Answer my question. If you didn't corroborate, if you didn't exhaust the claim, you can't bring it here because I can't help you. It's true that the claim was not exhausted at the appellate level. Petitioner did ask for that. . . did ask for a continuous on two occasions during the hearing to submit a letter from his mother, and the judge declined those. But if you didn't raise this to the BIA, how can you raise it before us? It can't be raised before this Court, Your Honor, as with regard to the issue of corroboration. If it wasn't raised below, we'll concede to that issue. Okay. With regard to the corroboration, I will note the judge cited six specific items, a birth certificate showing who his father was, his mother's marriage certificate, a letter from his mother, a letter from a stepfather, a letter from his sister, and a household register showing that he resided with the village leader. Specifically, what Petitioner would argue is that this comes down to two of these items. He submitted his birth certificate in the record. It did show that the gentleman by the name of Yi Chang Shi was his father. However, that's likely because he was born when that person was in the household, when his mother was allegedly married to this individual. With regard to his mother's marriage certificate, he was never on notice for that document. In addition, the household register showing him residing with the village leader, he was only with the village leader's family from October 2002 to November 2002. So it's highly unlikely that he would be registered with that family. Petitioner believes that specifically the adverse credibility finding with regard to who his stepfather is and with regard to his travel plans does not amount to substantial evidence. Essentially, his stepfather, he mentioned clearly that his mother married this individual while he was in utero. He was born subsequent to that. That's why this person was always referred to as stepfather. He believes he's provided a reasonable explanation. In addition, with regard to his travel plans, it appears that a smuggler was used to obtain all of his documents to travel from China to Ecuador, as well as from Ecuador to the United States. Petitioner was simply unaware of what those plans were in place. With that, I'd like to reserve the remainder of my time for rebuttal. Okay. Thank you, Counselor. Let me do so. Thank you. May it please the Court, Jeremy Byland on behalf of the respondent. Substantial evidence supports the immigration judge's decision about firm resettlement and adverse credibility, which was properly upheld by the Board. For firm resettlement under 8 U.S.C. 1158, there's a four-step inquiry. The first stage of that step is the government, DHS, has to provide a prima facie evidence. The petitioner was firmly resettled in Ecuador. And our DHS did carry that burden. We provided a census document, an Ecuadorian ID document that was valid for 12 years that indicated that he was an immigrant, not a non-immigrant, but an immigrant under 10-1-I-I-I for industrial investor. Tell me, why was he brought up to the U.S. by the government? Flew him up from Ecuador, Miami, I guess, and then up to New York to assist in an investigation on smuggling? Yes, Your Honor. And then when he gets to New York, he's abandoned. So, Your Honor, the chain of events, there's not an indication in the record, at least that I'm aware of, that the government paid for his flights, but he was given the parole document that he could travel on. So he was given the parole document, he traveled to Miami, and he testified that he was interviewed there in Miami. And the reason that he was brought to Miami was to testify about a smuggling operation in Ecuador. That parole document was signed by the U.S. consular in Ecuador. It was obtained in Ecuador. And then after that interview in Miami, he was allowed, not sent, but allowed to go to New York because he had relatives in New York.  I don't have details on that, but that's why he was brought. He was brought to Miami. Counsel, maybe the more interesting question is what happened in Ecuador to get him the parole in the first place. His whole story, I have to say that the longer I listened to this story, the weirder it got. I mean, the whole, we've been doing this for a long time here, these asylum cases, and I don't think I've ever seen a compelled marriage case come out of China. And then the firm resettlement in Ecuador was an odd story, and then being paroled into the U.S. just seemed to compound all of this. Now, his story in Ecuador is that somebody named Grandpa Chen has been manipulating all of this in Ecuador. Yes, right. And he seems to suggest that Grandpa Chen may have manipulated this to get him into the U.S. as well. Now, given the odd circumstances, that is that he's paroled out of the consulate in Ecuador, the U.S. consulate, and comes to the United States, is interviewed in Miami, and then he just disappears. The U.S. seems to have no interest in him whatsoever. I don't think that's true. The NTA was issued right after his parole ended. So it's not the case that he just went to New York and fell off. He went to New York. He was granted 90 days parole in the United States, basically as a quid pro quo for coming and testifying about the human trafficking operation. So he had a 90-day parole. The NTA was issued right after that parole ended. So it's not the case that the U.S. government didn't have an interest in where he went afterwards. They gave him the opportunity to come to the United States on a trip and be paroled in exchange for information about the smuggling operation. Now, Your Honor, I think that what the record indicates is that he was involved in smuggling operations in Ecuador, was probably smuggled in, that maybe that investor. Well, I mean, you know, he's got Uncle Chen or Grandpa Chen, and then we've got Uncle Sam involved in this, too. And he's been here all these years. Yes, Your Honor, but the reason it's taken so long to get him this time is there was he failed to appear and there had to be a motion to reopen. He was ordered to be removed in absentia. They filed a motion to reopen. That motion was granted. There was a continuance that was granted for two years. So he could obtain corroboration. He was given notice on page 158 of the record that he needed to obtain corroboration if this was a real ID act. He had to obtain what? He was specifically told that he needed to obtain corroboration, and then given a two-year, or he was given a continuance, which extended into two years for him to obtain that before cross-examination occurred. Corroboration for what, again? Corroboration for the events that happened in China and then, like, this trip to the United States, the trip to Ecuador and the United States. So both of those issues were mentioned. Well, forget about what happened in China. We brought him over here and paid for him to come here from Ecuador. I don't think it's in the record that we paid for him to come to Ecuador. At least I'm not aware of that fact. No, we didn't pay for him to go to Ecuador. I said we gave him. Didn't we provide for him to leave? Where was he staying, in Ecuador now? I'm not aware of the city. We provided him the document that allowed him to do so, but I'm not aware of the fact that we paid for him to be brought here. Well, how did he get here? Grandpa Chen. I mean, is he an agent of the U.S. government? Grandpa Chen? He's not, Your Honor, but specifically, I don't think the facts are in the record about who paid for his trip to Miami. We just know that the U.S. consular. With the parole document, he could have paid for his own trip to Miami. He was allowed to come in. It was effectively a visa. The allowed admission is the benefit that he was given in order to testify about the human trafficking. And again, he was interviewed in Miami. It's in the record in his testimony. So how did he get the money to get to Miami? Well, it's an interesting question. To get the industrial investor visa in Ecuador, it's a pretty substantial investment in Ecuador, so I think this kind of supports the adverse credibility determination because he said he only had a couple hundred dollars when he came to Ecuador, but he got two very unique statuses, one in Ecuador and one in the United States. So I'm not aware of where he got the money, but it does seem to undercut his claim of only having a couple hundred dollars. But what's our relationship with Grandpa Chen? You know, I can't speculate on that. He might be the person that Petitioner testified against. I can't speculate on Grandpa Chen. But what the issue is is— Well, why are we dealing with Grandpa Chen? That's Petitioner's testimony, and we found that testimony to be incredible. Is there evidence that Grandpa Chen is in Ecuador? Is that correct? Yes, Your Honor. There's no evidence that he came, and the only evidence we have that he facilitated the parole document is from Petitioner, and that evidence was not found in Ecuador.  The consulate, yes, Your Honor. Yeah, so we're doing business with him. There's no evidence in the record besides incredible testimony from Petitioner that Grandpa Chen was dealing with the consulate in Ecuador. And, in fact, his picture is on the parole document indicating that he went to the consulate, further undermining his testimony that he's never talked to a government official, a U.S. government official, to get that document, and undermining his testimony that he didn't know what the parole document was or what his status was when he came into the country. Doesn't this all sound kind of fishy? It sounds like a smuggling operation into Ecuador, and then it sounds like he got paroled into the United States to testify about that, was given the 90 days as a carrot to testify, and that after that 90 days expired, he didn't get another type of visa, and we issued the NTA to remove. And then? As to the prima facie case, the government doesn't – the prima facie case is established under a matter of AGG by providing certain documents and certain background evidence to suggest that the individual can stay in the other country as a permanent resident. And so DHS provided those in the form of two different ID cards, a census ID card and then an ID card, and then background evidence indicating what those ID cards meant. And that background evidence suggested that this ID card was the only identification we'd have as a permanent resident, and also it was an immigrant visa, not a non-immigrant visa. So it's a permanent resident, not a temporary situation. And the thing about the expiration date, our LPR cards that we issue in the United States to lawful permanent residents also have expiration dates on them. It doesn't mean that that person's LPR status doesn't continue beyond the expiration date. It just means that they have to go renew and check in with DHS. And Petitioner – so how the framework works is Petitioner, after DHS provides a prima facie case, should present rebuttal evidence to suggest that he wasn't permanently resettled. And Petitioner didn't provide that rebuttal evidence, and so the immigration judge was justified in making that determination. Does he meet any of the Johnson factors? Your Honor, counsel reached out to me, and I provided a packet to DHS about prosecutorial discretion, and that was denied based on adverse credibility and the smuggling issue. How long ago was this? This was last week. What? Last week, Your Honor. So I'm not optimistic that mediation – Oh, it was denied last week? Yes, Your Honor. Yeah, counsel and I have corresponded about this over the last couple weeks, and I believe last week is when I received the answer and sent that to counsel. So I'm not optimistic that mediation can resolve this case. So what do we do with him now? Well, Your Honor, because substantial evidence supports the immigration judge's determinations, I think this Court upholds that decision. I'm asking what the government is going to do with him now. Well, presumably after the order of removal becomes final, after this petition is resolved, if it's upheld by this Court. So if it's not upheld by this Court, then it would be remanded back to the Board. If it was upheld by this Court, then DHS would try to get travel documents to Ecuador first, and if they can't get documents to Ecuador, then they would try to get documents to China. We're not sending anybody back to China, is that correct? In fact, the immigration judge said that if he can go back to Ecuador, he should be sent back to Ecuador. That's what the immigration judge's designated country of removal. If he can't go back to Ecuador, then where does he go? We would try to get travel documents to send them back to the People's Republic of China. As to the adverse credibility determination, this is a very high standard of review in this case, and there's inconsistencies from the documentary evidence in his testimony, having to do with his father, having to do with moving into the chief's home, having to do with his mother moving into his stepfather's home, having to do with the identity of his stepfather. That's all activities that happen in China. And I will note, if you look at the household registry, it does note that his sister moved out, page 619 of the record. So there are annotations on there when people move out or move in, but there's nothing there for Petitioner. And then as far as this trip to Ecuador and trip to the United States, the nature of these very special statuses in both Ecuador and the United States makes his testimony that he didn't know was going on implausible. And I will say, if you do reach the particular social group issue, which you don't have to based on what I believe is strong evidence in the record supporting adverse credibility and firm resettlement. So there's two issues going on with the PSG particular social group. There's a nexus finding, and then there's the actual determination about whether it's a particular social group. That determination about whether it's a particular social group would have to be remanded because of intervening board precedent. But again, that only comes into play if he's found credible and found not to firmly resettle. So the United States doesn't feel as if the government has any moral obligation to this person. Well, Your Honor, there's no indication, there's no credible testimony or credible evidence that he's in danger in Ecuador. He said his only basis for being concerned in Ecuador is that he sent a Bible to his mother and that he thought that plainclothes Chinese policemen would come to Ecuador and capture him, and that's just not plausible. So as far as a moral obligation, I think there's evidence in the record that he had jobs in Ecuador. Well, why did we bring him out here? Why did we want him out here in the first place? As I said, Your Honor, I think the 90-day parole into the United States, and again, he had relatives in New York that he could visit, was a carrot to get him to testify about smuggling operations. Well, why did we even want him here? Presumably for that interview in Miami, but I don't know that for sure. But he did have an interview in Miami. Well, we have agents in the consulate in Cusco, isn't it, the capital? Your Honor, we do have agents there, but presumably this was a carrot to entice testimony. A carrot for what? In exchange for his testimony about the smuggling operations. So it was an undercover investigation of the alien smuggling operation, and in the record it indicates that he was… You know, you talk so fast. I'm sorry, Your Honor. My hearing aids are trying to keep up with you. You're overworking. Sure. So there was an undercover alien smuggling investigation in Ecuador, and they wanted him to testify about that. And so as a carrot or as an incentive, they allowed him to be paroled into the United States for 90 days in order to testify. What part of a carrot, presumably, being that he had an uncle in the United States that he could then go and visit? Correct, in New York. It's in the record that he had family in New York, and his parole document specifically stated that after he went to Miami, he could then go to New York where his relatives were. So that's, I think, what the record supports as to that interaction with him. So you think when they interviewed him in Miami, we concluded that he wasn't of any real value? I cannot speculate as to the contents of that interview, but that interview did occur, and I don't know what information they obtained from that or did not obtain from that. But I don't think it's odd. Well, whatever it is, it's classified. I don't know that there's an ongoing investigation, but I'm not privy to the information that was gleaned from that interview, Your Honor. If there's no further questions, we'd ask that you deny the petition for review. Okay. Thank you. Mr. Rohrer, do you have some time? I'll give you, I think you're over your time, but I'll give you a minute. Thank you. Yes, sir. Essentially, Judge Fragerson's question is right. It's what the government's going to do with him. The care extended to Petitioner Mr. Yee was a 90-day stay in the United States followed by essentially a notice to appear ordering him removed from the United States. But that's not too surprising to him, right? He was granted 90 days to come to the United States for a particular purpose. We allowed him to go visit his relatives. It was very kind of us to do so. And at the end of 90 days, he knew he was supposed to go back to Ecuador. So what's the problem? Well, we don't know if he knows he was supposed to go back to Ecuador. Well, he should have known he was supposed to go back to Ecuador. It was on his documents. For all that, it was a significant public benefit, which could mean that there was serious investigation going on. Well, but that seems to be within the discretion of the United States as to whether they need him anymore. But he knows he's got 90 days, and then he's to go back. I mean, it was a limited purpose. Well, I think the position is, Your Honor, is that he knows he has 90 days, and then he has to do something, whether it be apply for relief, apply for such as a T visa as a testifying to criminal activity, or return to a third-party country in that respect. With that, I would ask that this Court grant the petition for review, or in the interest of remand, the petition for review. Thank you very much. Thank you. We thank counsel for the argument. Ye versus Lynch is submitted.
judges: Pregerson, Bybee, N.R. Smith